# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Senior Judge Marcia S. Krieger

**Civil Action No. 17-cv-02791-MSK-NYW**

**WILLIAM G. BROACH,**

    **Plaintiff,**

**v.**

**ANGELA MORRIS,**
**MUTHULAKSHMI YEGAPPAN,**
**LAURA SOMMERSCHIELD,**
**STACI LEIGH,**
**VANI RUSSELL,**
**ANTHONY A. DECESARO,**
**JOHN AND JANE DOE(S),**
**RICK RAEMISCH,**
**MIKE ROMERO,**
**RANDY LIND, and**
**RYAN LONG,**

    **Defendants.**

---

## OPINION AND ORDER ON MOTION TO DISMISS
---

**THIS MATTER** comes before the Court on Muthulakshmi Yegappan's and Vani Russell's Motion to Dismiss **(# 53)**, Plaintiff's Response **(# 74)**, and the Reply **(# 76)**.

## **FACTS**

The Court provides a brief summary of the pertinent well pled allegations in the Second Amended Complaint **(# 52)** and elaborates as necessary in its analysis.[1]

---

[1] The pending motion seeks to dismiss the claims asserted against Defendants Muthulakshmi Yegappan and Vani Russell. In his response to the motion, Mr. Broach indicates his desire to "reduce the number of defendants to the two whose actions are well documented: Ms. Morris and Dr. Yegappan." **(# 74 at 2)**. Also, on May 5, 2020, the parties filed a Stipulation of Dismissal of Defendants Laura Sommerschield, Staci Leigh, Vani Russell,

At all relevant times, Mr. Broach[2] was an inmate incarcerated in the custody of the Colorado Department of Corrections (the "CDOC"). **(# 52 at 9)**. He contends that over a period of 22 months, the Defendants – all CDOC employees – delayed provision of medical care and/or failed to provide him appropriate medical care, causing permanent vision loss in his right eye. **(# 52 at 9)**.

On October 8, 2016, Mr. Broach first complained of vision issues with this right eye. He reported to CDOC Clinical Services staff that he had a large quantity of "black dots, or specks" that impaired his vision in his right eye and submitted a medical "kite", requesting an eye examination. **(# 52 at 9)**. Thereafter, Mr. Broach received a written communication from an unidentified CDOC employee advising him that he was ineligible for an optometry examination, because according to CDOC policy, inmates were permitted only a single annual examination and his had occurred four months previously. **(# 52 at 9)**. Mr. Broach contends this policy prevented him from receiving a prompt diagnosis of a retinal tear, which can be repaired by a simple medical procedure. **(# 52 at 9)**. Thus, Mr. Broach waited four months for a diagnosis and contends that by that time, his injury had progressed to a more serious condition – a mature detached retina with severe scarring – reducing his chance for full recovery of his vision. **(# 52**

---

Anthony DeCesaro, John and Jane Doe(s), Rick Raemisch, Mike Romero, Randy Lind and Ryan Long, without prejudice **(# 79)**. Thus, the Court dismisses claims against Defendants Sommerschield, Leigh, Russell, DeCesaro, Raemisch, Romero, Lind, Long, and any unknown CDOC employees from this action. To date, the Court has not received confirmation from the United States Marshal Service that Angela Morris has been served. **(# 66, # 67)**. Thus, this Opinion focuses on the Second Amended Complaint's well-pleaded allegations related to Dr. Yegappan and any relevant background information.

[2]     Mr. Broach appears in this action *pro se.* Accordingly, the Court reviews his pleadings and other papers liberally, and holds them to a less stringent standard than that applicable to those drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519, 520-521 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110, 1110 n. 3 (10th Cir. 1991).

**at 9)**. On February 28, 2017, Mr. Broach underwent his first eye surgery which was performed by Dr. Feinstein at the Denver Health Eye Clinic. **(# 52 at 11)**.

Following the surgery, Mr. Broach contends he was denied proper follow-up medical care. **(# 52 at 11)**. The Second Amended Complaint specifically alleges that three days after the first eye surgery, Mr. Broach detected a "detachment of the untreated portion of his retina" in the right eye and reported this concern to Dr. Yegappan, a CDOC physician at the Denver Receiving and Diagnostic Center ("DRDC"). **(# 52 at 11-12)**. Mr. Broach twice requested that Dr. Yegappan contact the Denver Health Eye Clinic per Dr. Feinstein's instruction, but "Dr. Yegappan refused to make the phone call." **(# 52 at 12)**. On March 9, 2017, Mr. Broach saw Dr. Feinstein for a follow-up appointment. Dr. Feinstein informed Mr. Broach that the "entire untreated half of [his] retina had detached including the macula, and scarring had already begun" and expressed the urgent need "for a second operation." **(# 52 at 12)**. The Second Amended Complaint alleges that Dr. Feinstein recorded his observations and recommendation for a second surgery in a medical report. **(# 52 at 12)**.

The Second Amended Complaint alleges that on March 15, 2017, Dr. Yegappan prepared a medical report in which she acknowledged Dr. Feinstein's observation that Mr. Broach had a "continuous partial detachment" but the report did not refer to the macula and described the eye injury as "stable". **(# 52 at 12)**. The next day, Dr. Yegappan discharged Mr. Broach from the DRDC infirmary and removed all of his medical restrictions. **(# 52 at 12)**.

According to the Second Amended Complaint, on April 14, 2017, Mr. Broach had a follow-up appointment at the Denver Health Eye Clinic with Dr. Siringo who noted severe scarring had occurred in Mr. Broach's right eye. **(# 52 at 12)**. Dr. Siringo indicated that a "retinectomy (cutting out the irreparable sections of the retina) may be necessary" and expressed

3

little optimism that Mr. Broach's vision loss "could be restored without damage." **(# 52 at 12)**. Dr. Siringo further noted that as of April 14, 2017, a second surgery had not been requested by the CDOC. **(# 52 at 12-13)**.

Mr. Broach underwent a second eye surgery on May 10, 2017, nearly two months after the second detachment of the macula. **(# 52 at 13)**. The Second Amended Complaint alleges that a "retinectomy was needed in the effort to get the retina to lie flat, but the macula was beyond restoring." **(# 52 at 13)**. On May 22, 2017, Mr. Broach had a third eye surgery to "reattach the edges of the retina." **(# 52 at 13)**. Mr. Broach's vision continued to deteriorate, and it was "discovered that a retinal vein occlusion (blockage) had occurred, starving a quarter of the retina for blood, leading to the creation of new veins that blocked the light from passing through the retina." **(# 52 at 13)**. Due to the extent of the damage to Mr. Broach's eye and the resulting complications, he was required to undergo follow-up care for the next 15 months. **(# 52 at 13)**. During this time, Mr. Broach underwent various eye treatments including injections, a laser treatment, and removal of an undissolved suture but continued to suffer from "uncontrolled intraocular pressure", which ultimately caused glaucoma. **(# 52 at 13)**.

Based on these allegations, the Second Amended Complaint states four claims, all asserting violation of Mr. Broach's Eighth Amendment right to freedom from cruel and unusual punishment pursuant to 42 U.S.C. 1983. **(# 52)**. The only claim at issue is Claim II brought against Dr. Yegappan.[3] In Claim II, Mr. Broach contends that Dr. Yegappan was deliberately

---

[3]   Claim I is brought against Dr. Morris, who has apparently not yet been served. On March 9, 2020, the Magistrate Judge ordered the United States Marshal Service to serve a copy of a summons and the Second Amended Complaint on her. **(# 66)**. However, to date, the Court has not received the service paperwork and presumes service efforts are ongoing.

Claims III and IV are brought against Defendants Ms. Leigh, Ms. Russell, Mr. DeCesaro, and unknown CDOC employees. However, as the Court previously noted, at Mr. Broach's request in his response **(# 74 at 2)** and the parties' stipulation **(# 79)**, the claims against these

indifferent to his medical needs and caused delay in the diagnosis of his condition by (i) refusing to report Mr. Broach's post-surgery complications and condition to his treating specialist and (ii) instead declared his injury as "stable" and discharging him from the infirmary.  Because Mr. Broach's second surgery was delayed, he experienced permanent vision loss.  **(# 52 at 11-13)**.  Construing Mr. Broach's allegations liberally, the Court treats Claim II as asserted against Dr. Yegappan in both her official and individual capacities. [4]

Dr. Yegappan seeks dismissal of Claim II in its entirety.  She contends that to the extent that it is viewed as an official capacity claim, it is barred by Eleventh Amendment immunity[5].  Viewed as an individual capacity claim, she asserts the Second Amended Complaint fails to state a claim for deliberate indifference to a serious medical need and that such claim is barred by

---

Defendants are dismissed. **(# 52 at 13-15)**.
   Mr. Broach seeks compensatory monetary damages of $1,000,000 for each Defendant's wrongful act and an additional $500 per day for continued lack of care; $1,000,000 to fund necessary accommodations for visually impaired CDOC inmates; and various injunctive relief including requiring the Defendants to change unspecified policies to allow Mr. Broach to complete all required programs and classes on an expedited basis before his condition worsens. **(# 52 at 17-18)**.

[4]   The Second Amended Complaint states that Claim II is brought against Dr. Yegappan in her official capacity only **(# 52 at 4)**, however, Mr. Broach explains this omission was an oversight (due, in part, to his vision impairment) and he intended to bring this claim against Dr. Yegappan in her individual capacity as well **(# 52 at 3-4)**.

[5]   It is well established that official capacity suits against public employees are properly construed as suits against the state itself, *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), and that Section 1983 claims against states by their own citizens seeking either money damages or retrospective declaratory relief are barred by the Eleventh Amendment, *see White v. State of Colo.*, 82 F.3d 364, 366 (10th Cir. 1996).  Here, Mr. Broach seeks both award of money damages and prospective injunctive relief; to the extent such suits seek prospective injunctive relief, they are not barred by the Eleventh Amendment.  Accordingly, the Court construes Mr. Broach's claim as brought against Dr. Yegappan in her individual capacity to the extent he seeks award of monetary damages and as brought against her in both her individual and official capacities to the extent he seeks prospective injunctive relief.

qualified immunity. Finally, Dr. Yegappan contends that Mr. Broach's claim is barred by the application of the *res judicata* doctrine, because it was raised and determined in a state court action[6].

## LEGAL STANDARDS

### A. Standard of Review

In determining the adequacy of the Second Amended Complaint, the Court limits its consideration to the four corners of the pleading, any documents attached thereto, and any external documents that are referenced in the pleading the accuracy of which is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001). The Court accepts all well-pled allegations in the Second Amended Complaint as true and views those allegations in the light most favorable to Mr. Broach. *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires the Court to discard averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a

---

[6] In a previous Opinion granting Defendants' motions to dismiss Mr. Broach's Amended Complaint **(# 45)**, the Court declined to consider what is essentially the same *res judicata* argument raised here because it "requires consideration of facts not alleged in the Amended Complaint and of documents not incorporated by reference therein." **(# 45 at 6 n.9)**. The circumstances have not changed. The Second Amended Complaint contains no allegations that pertain to a state court lawsuit nor does it mention any documents related to the lawsuit. Thus, the Court declines to convert Dr. Yegappan's *res judicata* argument to a summary judgment motion at this juncture and accordingly excludes the evidentiary proffer in its support. It can be addressed in conjunction with a Rule 56 motion.

cause of action, supported by mere conclusory statements". Then, taking the remaining, well-pled factual contentions as true, to ascertain whether they support a claim that is "plausible" as compared to one that is merely "conceivable" or "possible" under the facts alleged. What is required to reach the level of "plausibility" varies from context to context, but generally allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

A *pro se* plaintiff's complaint should only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Courts are not, however, required to accept as true a *pro se* plaintiff's conclusory allegations, but rather need only accept as true the plaintiff's well-pled factual contentions. *See Dunn v. White*, 880 F.2d 1188, 1190 (10th Cir. 1989), *quoting Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

### B. Qualified Immunity

Dr. Yegappan asserts the defense of qualified immunity on Mr. Broach's Eighth Amendment deliberate indifference claim. Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). When a defendant asserts a qualified immunity defense in a motion to dismiss, the Court determines (1) whether a complaint's allegations are sufficient to show that the defendant violated a constitutional or statutory right and (2) whether the constitutional or

statutory right was clearly established when the alleged violation occurred. *See Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004).

For all practical purposes, the first inquiry is indistinguishable from the inquiry that the Court would take in assessing a garden-variety challenge under Federal Rule of Civil Procedure 12(b)(6) to the sufficiency of the pleadings. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001). The "clearly established" inquiry for qualified immunity examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 132 S. Ct. 2088, 2093 (2012).

A court may begin its analysis by focusing on either prong. In this case, the Court begins with the first – do the Second Amended Complaint's allegations sufficiently show a constitutional violation?

## ANALYSIS

### A. Individual Capacity Claim

1. Constitutional Violation

The Eighth Amendment's prohibition of cruel and unusual punishment requires prison officials to provide incarcerated persons with humane conditions of confinement, including adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008), *citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Accordingly, prison officials violate the Eighth Amendment where they are deliberately indifferent to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish deliberate indifference requires two types of proof: objective indifference and a subjective indifference. *See Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005), *citing Sealock v. Colorado*,

218 F.3d 1205, 1209 (10th Cir. 2000).

At the pleading stage, the objective showing requires a prisoner to allege facts that establish a serious medical condition. *See Farmer*, 511 U.S. at 834. Dr. Yegappan does not challenge the sufficiency of the allegations of the Second Amended Complaint in this regard. Thus, the Court finds Mr. Broach has alleged a sufficiently serious medical condition for the purposes of his medical indifference claim.

The subjective showing requires a prisoner to allege facts sufficient to show that a defendant "acted with a sufficiently culpable state of mind." *Vega v. Davis*, 673 F.App'x 885, 890 (10th Cir. 2016); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[A] prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists [either by denying or delaying appropriate medical care], and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotations marks omitted). This requires factual allegations that show that the defendant was aware of facts suggesting a risk and that the defendant determined that the risk was present. *See id.* Mere negligence in the provision of medical care or other inadvertent failure to provide adequate medical care to an incarcerated person does not rise to the level of deliberate indifference. *Estelle*, 429 U.S. at 105-106.

Additionally, a medical professional can be liable under the deliberate indifference standard if she "knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if [she] delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that [she] may also be liable for deliberate indifference from denying access to medical care." *Sealock*,

218 F.3d at 1211. In order to "establish gatekeeper liability, a plaintiff must still allege that the need for medical care was obvious to the prison official." *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016). This circumstance can arise when "a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and [her] corresponding lack of expertise but nevertheless declines or unnecessarily delays referral." *Self*, 439 F.3d at 1232.

Here, Dr. Yegappan challenges the sufficiency of the allegations in the Amended Complaint to show subjective indifference. More specifically, she argues that Mr. Broach makes only "conclusory statements that [she] discharged him from the infirmary and removed his medical restrictions" and "provides no allegations regarding Dr. Yegappan's culpable mental state." **(# 53 at 13)**. Dr. Yegappan also argues that Mr. Broach's allegations might form the basis for a malpractice claim, but do not rise to the level of subjective indifference. The Court disagrees.

It is true that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997). However, the Court does not understand Mr. Broach to assert that Dr. Yegappan was negligent in diagnosing his medical condition or treating his retinal detachment. Rather, her actions concern his post-surgery complications, particularly refusing to contact Mr. Broach's eye surgeon when he experienced complications after his first eye surgery. Reading the allegations in the Second Amended Complaint most favorably to Mr. Broach: 1) Dr. Yegappan was aware Mr. Broach was being monitored by Dr. Feinstein who was to be contacted if any post-surgical complication arose; 2) Dr. Yegappan was aware that a serious complication from the surgery (retinal and

macula detachment) could potentially lead to vision loss; and 3) Mr. Broach reported he was experiencing complications and twice requested that Dr. Feinstein be contacted, but Dr. Yegappan refused to do so. Taking these allegations as true, they are sufficient to establish both a serious medical condition and subjective indifference. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) ("Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems.").

In addition, the Second Amended Complaint alleges that Dr. Yegappan declined to follow Dr. Feinstein's "urgent" recommendation for a second surgery to address Mr. Broach's detached retina, and instead discharged Mr. Broach from the infirmary and declared his injury as "stable". **(# 52 at 12)**. This resulted in a delay of his second surgery for two months, exacerbating the problems with his eye **(# 52 at 12)**. This, too, is sufficient to establish a serious medical condition and subjective indifference. *Id.*; *Self*, 439 F.3d at 1232 (recognizing that a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition may constitute deliberate indifference). *Martinez v. Garden*, 430 F.3d 1302, 1305 (10th Cir. 2005).

### 2. Clearly Established

The second prong of the qualified immunity analysis focuses upon whether the constitutional right was "clearly established" at the time it was violated. The "clearly established" analysis examines whether there was existing precedent, at the time of the challenged events, that recognized a constitutional violation in similar circumstances. Courts are required to conduct the "clearly established" analysis at a "high degree of specificity," rather than in generalities. *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). However, the

specificity requirement is not so exacting that "the very action in question [must have] previously been held unlawful." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1866 (2017).

The Court finds that cases such as *Garrett v. Stratman*, 254 F.3d 946 (10th Cir. 2001) clearly establish that Dr. Yegappan's conduct in this case could constitute an Eighth Amendment violation. Similar to the facts of this case, in *Garrett*, the inmate sustained a shoulder injury and a specialist recommended reconstructive surgery. The prison officials did not transfer the inmate for a consultation with an orthopedic surgeon for eleven months. By that time, because proper medical treatment had been delayed, the surgery could not be performed with any degree of success, causing the inmate pain and suffering and a severe disability. *Id.* at 948. The 10th Circuit noted that a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Id.* (citing *Oxendine*, 241 F.3d at 1276). The "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* Thus, the 10th Circuit found that such conduct as demonstrated in *Garrett* could constitute a violation of the inmate's Eighth Amendment rights, and further, that the contours of that right were "clearly established." In light of *Garrett*, this Court concludes that the unconstitutionality of the conduct Mr. Broach alleges here was "clearly established" by 2001, such that Dr. Yegappan is not entitled to qualified immunity in her individual capacity.

### B. Official Capacity Claim

The Court now turns to Mr. Broach's official capacity claim. An official capacity claim, in all respects other than name, is a claim against the governmental entity employing the official. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, Mr. Broach's 42 U.S.C. § 1983 official capacity claim constitutes a claim against the CDOC.

Section 1983 prohibits a person acting under color of law from violating another's rights guaranteed under the United States Constitution. The definition of "person" under § 1983 includes local government entities, such as counties, cities, and towns. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, local government entities are liable under §1983 "only for their own illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). The doctrines of vicarious liability and *respondeat superior* do not apply, and therefore, "[a] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell*, 436 U.S. at 692). Rather, to establish a *prima facie* § 1983 claim against a governmental entity, a plaintiff must produce sufficient evidence to show (1) the existence of a government policy or custom, which (2) directly caused an injury to the plaintiff. *Id.* Accordingly, a plaintiff may show a government policy or custom in the form of any of the following ways:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express [government] policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla.*, 627 F.3d 784, 788 (10th Cir. 2010).

For this analysis, the Court has already determined that Mr. Broach's eye problems constituted a serious medical need and that the loss of his sight in one eye was a constitutional injury. The question is whether the allegations of the Second Amended Complaint sufficiently identify the applicable policies, that they were enacted/maintained with deliberate indifference to inmate needs and that their enforcement caused injury to Mr. Broach. The allegations are not

sufficient in the latter two respects.

Simply put, there are no factual allegations that could show the existence of a CDOC policy or custom that was the moving force behind the constitutional deprivation related to Mr. Broach's claim for deliberate indifference to a serious medical need. While the Second Amended Complaint mentions the CDOC's policy of providing inmates with only one annual optometric examination (**# 52 at 9-10**), there is no allegation that this policy was enacted or maintained by the CDOC with indifference to the effect upon inmates generally or particularly to Mr. Broach.[7] Thus, the Court finds the Second Amended Complaint's allegations (i) are insufficient to show that the CDOC policy was the cause of delay of medical treatment and (ii) do not support the inference that the identified policy was maintained or applied with indifference to Mr. Broach's serious medical needs.

Accordingly, the official capacity claim is DISMISSED.

## CONCLUSION

For the foregoing reasons,

1. Muthulakshmi Yegappan's and Vani Russell's Motion to Dismiss (**# 53**) is **GRANTED** in part and **DENIED** in part, as follows:

    - The motion is **DENIED** insofar as the claim against Dr. Yegappan in her individual capacity will proceed.

    - The motion is **GRANTED** insofar as the official capacity claim is dismissed without prejudice.

2. As set forth in this Opinion, Defendants Sommerschield, Leigh, Russell, DeCesaro,

---

[7] Indeed, it appears from other allegations in the Second Amended Complaint that to the extent that such a policy exists, it was not enforced as to Mr. Broach because from February 2017 through May 2017 – a period of four months -- Mr. Broach had at least four optometry examinations and three eye surgeries. (**# 52 at 9-13**).

    Raemisch, Romero, Lind, Long, and any unknown CDOC employees along with Claims III and IV are dismissed from this action.

3. In light of the above rulings, Claim I asserted against Dr. Morris in her individual capacity and Claim II asserted against Dr. Yegappan in her individual capacity will proceed in this action.

Dated this 8th day of May, 2020.

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
Senior United States District Judge