IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 17-cv-02791-MSK-NYW

WILLIAM G. BROACH,

    Plaintiff,

v.

MUTHULAKSHMI YEGAPPAN,

    Defendant.

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

**THIS MATTER** comes before the Court on Muthulakshmi Yegappan's ("Dr. Yegappan") Motion for Summary Judgment **(# 129)**, Mr. Broach's *pro se*[1] response **(# 130)**, and Dr. Yegappan's reply **(# 131)**.[2]

**FACTS**

At all relevant times, Mr. Broach was an inmate incarcerated in the custody of the Colorado Department of Corrections (the "CDOC"). On November 2, 2016, Mr. Broach reported to his facility's medical clinic, complaining of "black spots in his right eye." He reported that he had been experiencing this condition for approximately a month. He was diagnosed as having a Unspecified Binocular Vision Disorder. He was referred for an ophthalmology consultation with an outside specialist.

---

[1]    The Court construes Mr. Broach's *pro se* filings liberally in accordance with *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

[2]    Mr. Broach's motions **(# 128, 132)** seeking a status updated on this case are denied, as moot.

1

The consultation occurred on February 10, 2017. The specialist determined that Mr. Broach was suffering from a retinal detachment and referred him for further treatment. The specialist stated that "as long as [his macula] remains attached, [the] prognosis for returned vision is better." The specialist noted that "no other treatment is recommended at this time" and the specialist stated that Mr. Broach "understands that he may not get all vision that he has lost back."

On February 19, 2017, Mr. Broach reported to his facility's medical staff that he had lost all central vision in his right eye, suggesting that his retina had detached. The attending nurse contacted Mr. Broach's specialist and was instructed that there was a "window of approximately 7 days" to effectively address the situation via surgery. Mr. Broach underwent retinal reattachment surgery on February 27, 2017.

For his recovery from the surgery, Mr. Broach was transferred from his regular facility to the infirmary at CDOC's Denver Reception and Diagnostic Center. Here he received treatment from Dr. Yegappan. Mr. Broach's post-surgical instructions included that he receive certain medications optically several times per day for a week and that he lie face down or on his left side for 22 hours per day for a specified period of time.

Medical records reflect that Mr. Broach was attended to by nursing staff on an almost daily basis with no complications for several days. A March 3, 2017 note from Nurse Vasiliki Damaskopoulou, stated that Mr. Broach "complained of some discomfort and he was given his Motrin when it was due as ordered." ( The nurse's note was apparently reviewed by Dr. Yegappan at some point thereafter, but there is no specific indication in the record of Dr. Yegappan actually meeting with Mr. Broach at this time.) The not does not indicate that Mr. Broach reported any difficulties relating to his vision at this time, and indeed, nursing notes from

the following day state that when Mr. Broach was advised to "notify medical for any unusual [changes] to the affected eye", he noted his agreement, but no complaints were made. It was not until March 5, 2017 that medical records first report that Mr. Broach complained of vision problems stating that "my blackness is getting worse." Those notes state that Mr. Broach represented to the nursing staff that "he told Dr. Yegappan on 3/3/2017" of that fact. The notes state that the nursing staff provided Mr. Broach with his eye drops as prescribed. It is undisputed that Dr. Yegappan provided no specific treatment to Mr. Broach during this period.

On March 9, 2017, Mr. Broach was seen by an external specialist for a scheduled follow-up. The specialist determined that Mr. Broach had suffered complications from the surgery and his retina had detached, again. The specialist determined that Mr. Broach would need a second retinal surgery, but it appears that the specialist did not intend for the surgery to occur immediately. Instead, the specialist directed that Mr. Broach appear for a "follow up" in "3-4 weeks" (unless a change in circumstances warranted earlier action). In the interim, the specialist merely directed that Mr. Broach continue to continue certain post-operative procedures. Following Mr. Broach's appointment with the specialist, he was also seen by Dr. Yegappan. The notes from that visit reflect that Dr. Yegappan reviewed the specialist's report and implemented the specialist's instructions.

On March 15, 2017, Mr. Broach was again seen by Dr. Yegappan. Dr. Yegappan observed that Mr. Broach had "continued partial detachment", and that medical staff "plan to take him back to [the operating room] in several weeks vs. [as needed] if his vision worsens." Dr. Yegappan noted that Mr. Broach "reports since his [follow-up on] 3/9 his vision loss is not progressing." Dr. Yegappan prescribed that "he will need to continue his eye drops [and] dark sunglasses. . . He should [follow up] with ophthalmology in 2 weeks or [as needed]." This was

3

the last time Dr. Yegappan treated Mr. Broach.

Mr. Broach underwent a second retinal surgery on May 8, 2017,[3] and a third surgery a couple of weeks later, along with extensive additional treatments over many more months. Those treatments were unsuccessful and Mr. Broach never regained vision in his right eye.

Mr. Broach disputes some of the preceding recitation. He contends that he was seen by Dr. Yegappan on three occasions: March 3, March 6, and March 16, and he complains that, on those three occasions, Dr. Yegappan "refus[ed] to notify [his specialists] about the sudden changes in his vision." (Mr. Broach also disputes, to minor degree, the dates on which certain other events occurred.) He also disputes Dr. Yegappan's contention that she first learned of his vision changes on March 9, as he contends that a nursing note from his reporting of vision loss to nursing staff on March 7 also mentions that "the provider" – presumably Dr. Yegappan – "has been informed."

Mr. Broach commenced this action, alleging claims pursuant to 42 U.S.C. § 1983 against an array of various CDOC officials. The sole remaining claim in this action is Mr. Broach's claim against Dr. Yegappan, sounding in violation of the 8th Amendment's deliberate indifference standard. Dr. Yegappan now moves **(# 129)** for summary judgment, arguing that Mr. Broach cannot demonstrate an Eighth Amendment claim on these facts.

## ANALYSIS

### A. Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

---

[3]   Nothing in the record suggests that Dr. Yegappan had any involvement in approving or scheduling the subsequent surgeries.

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Eighth amendment claims

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishment."  In the context of prison medical care, that amendment has been interpreted to prohibit prison medical staff from wantonly inflicting pain on an inmate by deliberately ignoring the inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To establish an Eighth Amendment claim, Mr. Broach must show: (i) that he had an objectively serious medical need, that is, one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for medical attention; and (ii) that a prison official subjectively knew of that medical need yet disregarded the risk of harm to the inmate's health or safety.  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  To satisfy the second element, the inmate must show that the official was subjectively aware of a substantial risk that the inmate could suffer serious harm if untreated.  *See e.g. Reneau v. Cardinas*, 852 Fed.Appx. 311, 314 (10th Cir. 2021).  The mere fact that a medical provider was negligent in diagnosing or treating a medical condition does not amount to an Eighth Amendment violation.  *Ortiz v. Torgenson*, __ Fed.Appx. ___, 2021 WL 1327795 (10th Cir. Apr. 9, 2021).  Rather, an inmate must show "an extraordinary degree of neglect" when challenging a provider's exercise of medical judgment.  *Id.*

Because the focus of the Eighth Amendment is the deliberate infliction of pain, an Eighth Amendment claim involving a delay in the administration of medical care also requires a

6

showing that a medical provider's indifference resulted in the inmate suffering "substantial harm" – that is "lifelong handicap, permanent loss, or considerable pain". *McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019). That harm may result from acute pain suffered by the inmate during the delay or by a showing by the inmate that there was treatment that had a realistic chance of success that could have been administered during the period of delay, but was not. *Beers v. Ballard*, 248 Fed.Appx. 988, 991 (10th Cir. 2007).

In this case, the parties have some factual disputes as to exactly how many times Dr. Yegappan treated Mr. Broach and the precise dates of that treatment. But those factual disputes are not particularly material to Mr. Broach's claim. Whether Dr. Yegappan saw Mr. Broach twice or three times, or whether those instances occurred on, for example, March 16th or March 15th do not meaningfully change the analysis. Taking the facts in the light most favorable to Mr. Broach, the Court will assume that he reported to Dr. Yegappan on March 3, 2017 that he was once again experiencing diminishing vision in his right eye. The Court will also assume that Dr. Yegappan did not promptly report that fact to anyone nor seek to expedite additional treatment for Mr. Broach. Instead, the Court will assume that Dr. Yegappan did nothing and simply waited for Mr. Broach's scheduled follow-up with his specialist six days later.

Even upon such facts, Mr. Broach cannot show that Dr. Yegappan's lack of treatment caused him to suffer any substantial harm.[4] The Court understands that Mr. Broach alleges that Dr. Yegappan's lack of treatment prevented him from receiving prompt treatment for the re-detachment of his retina and exacerbated the risks that complications from the first surgery

---

[4] The record reflects that Mr. Broach experienced some immediate pain as he recovered from his surgery, but nothing in the record reflects that he reported that pain to Dr. Yegappan or sought treatment for that pain from her. And, in any event, the record reflects that the facility's nursing staff regularly attended to Mr. Broach's complaints of acute pain.

7

would result in permanent vision loss. But the record does not support the assumption that Dr. Yegappan's delay contributed in any way to Mr. Broach's ultimate vision loss. When Mr. Broach was seen by a specialist on March 9, six days after Mr. Broach first reported his diminished vision to Dr. Yegappan, presumably Mr. Broach told the specialist about the same blackness in his vision that he had reported to Dr. Yegappan on March 3. The specialist did not find those symptoms to warrant urgent or expedited treatment. Instead, the specialist determined that Mr. Broach should wait at least 3-4 weeks or more before a new surgery was scheduled. Because no immediate treatment was warranted on March 9, 2017, the Court cannot conclude either that Dr. Yegappan had some obligation to render immediate treatment upon learning of Mr. Broach's condition on March 3, or that had an earlier report by Dr. Yegappan to the specialist would have changed the specialist's course of treatment. Put another way, nothing in the record[5] permits a conclusion that Dr. Yegappan's six-day delay in addressing Mr. Broach's situation caused any substantial harm to Mr. Broach.

The same rationale applies to alleged inaction by Dr. Yegappan following her final meeting with Mr. Broach on March 15 or 16, 2017. By that point, the specialist had already assessed Mr. Broach's condition and determined that no further treatment was necessary for several additional weeks. The record reflects that Mr. Broach reported to Dr. Yegappan that his vision had not deteriorated further between March 9 and March 15/16, and thus, there was no reason for Dr. Yegappan to provide any additional treatment.

---

[5]  Mr. Broach has not offered opinion testimony from any physician or medical expert drawing a causal connection between that six-day delay between March 3-9 and the unfortunate outcome Mr. Broach experienced.

Accordingly, because Mr. Broach cannot demonstrate that any deliberate indifference by Dr. Yegappan resulted in substantial harm to him, Dr. Yegappan is entitled to summary judgment on Mr. Broach's Eighth Amendment claim.

## CONCLUSION

For the foregoing reasons, Dr. Yegappan's Motion for Summary Judgment **(# 129)** is **GRANTED**.  The Clerk of the Court shall enter judgment in favor of Dr Yegappan against Mr. Broach.  There being no remaining claims against any other Defendants, the Clerk of the Court shall then close this case.  Mr. Broach's motions **(# 128, 132)** seeking an update on the status of this case are **DENIED AS MOOT**.

Dated this 24th day of September, 2021.

**BY THE COURT:**

_____

Marcia S. Krieger
Senior United States District Judge

9